# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP628-J |
| COMPLETE TITLE: | In the Matter of Judicial Disciplinary Proceedings Against the Honorable Leonard D. Kachinsky |

Wisconsin Judicial Commission,
            Complainant,
      v.
the Honorable Leonard D. Kachinsky,
            Respondent.

---

DISCIPLINARY PROCEEDINGS AGAINST KACHINSKY

---

| | |
|---|---|
| OPINION FILED: | July 9, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | |
|   COUNTY: | |
|   JUDGE: | |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the complainant, there were briefs filed by *Jeremiah Van Hecke* and *The Wisconsin Judicial Commission,* Madison.

For the respondent, there were a briefs filed by *Leonard D. Kachinksy*, Neenah.

**2019 WI 82**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2018AP628-J

STATE OF WISCONSIN  :  IN SUPREME COURT

**In the Matter of Judicial Disciplinary Proceedings Against the Honorable Leonard D. Kachinsky:**

**Wisconsin Judicial Commission,**

**FILED**

Complainant,

**JUL 9, 2019**

v.

Sheila T. Reiff
Clerk of Supreme Court

**The Honorable Leonard D. Kachinsky,**

Respondent.

---

JUDICIAL disciplinary proceeding.  *Judge suspended from eligibility for reserve judge status with condition.*

¶1  PER CURIAM.  We review, pursuant to Wis. Stat. § 757.91 (2017-18),[1] a judicial conduct panel's findings of fact,

---

[1] Wisconsin Statute § 757.91 (2017-18) provides:

The supreme court shall review the findings of fact, conclusions of law and recommendations under s. 757.89 and determine appropriate discipline in cases of misconduct and appropriate action in cases of permanent disability. The rules of the supreme court

(continued)

conclusions of law, and recommendation for discipline for the Honorable Leonard D. Kachinsky, a former municipal judge for the Village of Fox Crossing Municipal Court. We conclude that Judge Kachinsky's judicial misconduct warrants a three-year suspension of eligibility for the position of reserve municipal judge, commencing July 3, 2018, with the condition that before requesting an appointment by the chief judge to serve as a reserve municipal judge, Judge Kachinsky must successfully petition this court to establish his fitness to serve in that capacity.

¶2 Beginning in 1997, Judge Kachinsky served as a municipal judge for 21 years, first for the Town of Menasha Municipal Court and then for the Village of Fox Crossing Municipal Court. On July 3, 2018, this court, in the exercise of its superintending and administrative authority over the courts of this state, issued an order prohibiting Judge Kachinsky from exercising the powers of a municipal judge until further order of this court. Judge Kachinsky did not seek reelection in the 2019 spring election. Consequently, his term as the Village of Fox Crossing Municipal Judge expired on April 30, 2019. Judge Kachinsky's years of service would ordinarily render him eligible to serve as a reserve municipal judge pursuant to Wis. Stat. § 800.065.

---

applicable to civil cases in the supreme court govern the review proceedings under this section.

2

¶3 The Wisconsin Judicial Commission originally received an ethics complaint concerning Judge Kachinsky in June 2017. When the Commission notified Judge Kachinsky that it was investigating allegations of possible misconduct a few weeks later, it advised him that he should "scrupulously avoid retaliatory conduct or witness intimidation."

¶4 On April 4, 2018, the Judicial Commission filed a formal complaint against Judge Kachinsky in this court. The Judicial Commission's complaint alleged multiple violations of the Code of Judicial Conduct (Chapter 60 of the Supreme Court Rules (SCR)). Judge Kachinsky's answer admitted many of the factual allegations in the complaint, but denied others or offered explanations for his conduct. The Judicial Commission filed an amended complaint in September 2018, in response to which Judge Kachinsky filed an amended answer.

¶5 After the initial complaint had been filed, this court referred the matter to the chief judge of the court of appeals, who appointed three members of the court of appeals to serve as the Judicial Conduct Panel.[2] See Wis. Stat. § 757.87(3). The Panel conducted an evidentiary hearing on February 7-8, 2019. The Judicial Commission called a number of employees of the Village of Fox Crossing as witnesses. Judge Kachinsky represented himself and testified at the hearing.

---

[2] Judges Joan F. Kessler, Mark D. Gundrum, and William W. Brash, III were appointed to serve as the Judicial Conduct Panel, with Judge Kessler acting as the presiding judge.

3

¶6 Following the hearing, the Panel issued its Findings of Fact, Conclusions of Law, and Recommendation. This court ordered the parties to file simultaneous opening briefs and response briefs regarding the Panel's findings and conclusions. The parties did so.

¶7 The allegations of judicial misconduct in this matter fall under three headings. Most of the allegations of misconduct relate to Judge Kachinsky's interactions with M.B., the full-time manager for the Village of Fox Crossing Municipal Court. The second category of allegations are related to an email that Judge Kachinsky sent to a member of the village board regarding his interactions with members of the village administration and the village's filing of a complaint with the Judicial Commission. The third category of allegations relates to an email that Judge Kachinsky sent to the village's police chief regarding a case that was pending before him. Judge Kachinsky sent copies of that email to the village's attorney and a police records clerk, but did not send a copy to the defendant or defense counsel or otherwise notify the defendant that he had sent the email.

**Interactions with M.B.**

¶8 The Village of Fox Crossing Municipal Court holds court sessions lasting approximately 90-120 minutes approximately three times per month on Thursday evenings. There are only two individuals who worked at the municipal court during the relevant time period. Judge Kachinsky held the part-time elected position as municipal court judge. M.B. was the

4

full-time court manager, whose position was supervised by Judge Kachinsky. The municipal court judge and the court manager shared a small office in the Village of Fox Crossing municipal building.

¶9 Prior to the events at issue in this proceeding, when a different person was the court manager, Judge Kachinsky was physically in the municipal court offices on a very limited basis, usually only arriving shortly before court sessions were to begin and leaving shortly after the court sessions had ended.

¶10 Following the retirement of the prior court manager, Judge Kachinsky hired M.B. as the court manager in the spring of 2016. At the beginning of M.B.'s employment, she and Judge Kachinsky would have occasional conversations about their personal lives and developed a friendship. They also engaged in occasional joint activities outside of work, such as going on a few runs in September and October 2016 that Judge Kachinsky labelled "Judge K Challenge Runs."

¶11 Even before M.B. was hired as the municipal court manager, she and Judge Kachinsky had been "friends" on the Facebook social media website. Each had hundreds of "friends" on that website, including a number of mutual "friends."

¶12 Judge Kachinsky experienced serious medical problems from May 2016 to February 2017, which caused him at times to be hospitalized. During this time period, Judge Kachinsky and M.B. communicated about both work issues and other personal matters in what the Judicial Conduct Panel describes as "a mutually friendly and supportive fashion." In January 2017, M.B.'s

mother, B.S., sent Judge Kachinsky a get well card. Judge Kachinsky subsequently became Facebook "friends" with B.S.

¶13 The interactions between Judge Kachinsky and M.B. became strained beginning in March 2017 due to a couple of incidents that M.B. found concerning. First, in a public comment to a post on M.B.'s Facebook page, Judge Kachinsky stated that M.B. was "on her second honeymoon" at "an undisclosed location." M.B. informed Judge Kachinsky that his comment had been incorrect, and he apologized. When M.B. was back at work a few days later, Judge Kachinsky and a friend arrived at the municipal court office while M.B. was out of the office. Judge Kachinsky then hid behind a counter. When M.B. returned to the office, he popped up and shouted "roar," which startled M.B. During this visit, Judge Kachinsky was sufficiently loud and boisterous that his conduct disturbed nearby village employees. In addition, a "selfie" picture was taken during the visit. Following the visit, Judge Kachinsky sent M.B. an email, in which he stated that he hoped his visit had made her day and that the visit was something he was "more than happy to do for my best friends." M.B. was disturbed by Judge Kachinsky's conduct.

¶14 Approximately two weeks later, Judge Kachinsky asked M.B. to be in additional pictures of them and the office/courtroom. M.B. declined the request.

¶15 Having become concerned with Judge Kachinsky's conduct toward her, M.B. sent an email to Judge Kachinsky on April 18, 2017, in which she stated that it would help her focus on her

6

job if they kept their relationship work-related. Judge Kachinsky, however, did not want to limit their relationship to matters concerning M.B.'s job. In an April 20, 2017 email, he agreed to minimize discussion of non-business matters during business hours. He indicated that he wanted to continue having discussions about matters in their everyday personal lives. That same day Judge Kachinsky sent two additional emails to M.B. The first stated, among other things, that he really liked to stop by the office at least once a week. The second email, sent later in the afternoon, indicated that Judge Kachinsky had stopped by the municipal court office that day and stated that "[i]t was nice to talk with you in person today." The very next day Judge Kachinsky sent yet another email. In that email Judge Kachinsky expressed that he had been upset because he sensed a problem in their relationship, but that when he had stopped by the office the day before, it had been "like old times." He continued that "[i]t is complicated because I am both the boss and a close friend."

¶16 On Saturday, April 22, 2017, Judge Kachinsky sent M.B. an email stating that he would not bring in treats to the office except on birthdays because M.B. had expressed concern about having recently gained some weight while on a trip.

¶17 Three days later Judge Kachinsky told M.B. that he knew her mother had visited her house the preceding weekend because he had seen her mother's location on a "Nearby Friends" application on Facebook. Judge Kachinsky testified at the evidentiary hearing that he had not intentionally sought this

7

information, which had automatically appeared on his cell phone, and that he had told M.B. about it so that she could make her mother aware that her cell phone was broadcasting information about her location to others on the Facebook website. The disclosure of this information, however, was upsetting to M.B. The Judicial Conduct Panel noted that M.B. became visibly upset when describing this event during the evidentiary hearing.

¶18 That same day Judge Kachinsky sent M.B. another email stating that he was "always open to resuming the Judge K Challenge [Runs] if it fits in your schedule once a month or so." He continued that "[t]he exercise is good but the personal rapport aspect of it is actually more important."

¶19 Judge Kachinsky's emails and his disclosure about knowing the location of M.B.'s mother upset M.B. sufficiently that they led her to lodge a complaint against Judge Kachinsky with the village's Human Resources Manager, Lisa Malone. After the complaint, the Village Manager, Jeffrey Sturgell, had a telephone conversation with Judge Kachinsky in which he advised Judge Kachinsky that M.B. was overwhelmed by Judge Kachinsky's non-work communications. Sturgell believed that Judge Kachinsky agreed to change his behavior because he did not want to lose M.B. as an employee.

¶20 On May 4, 2017, the day after Sturgell spoke with Judge Kachinsky, Malone met with Judge Kachinsky and M.B. Malone explained to Judge Kachinsky the concerns with his behavior. During the meeting the participants developed a number of guidelines, including that no personal information

8

about colleagues would be shared on social media, that all phone and email communications would be related to business matters, and that Judge Kachinsky would limit his visits to the office to one time per week.

¶21 The Judicial Conduct Panel found that at the conclusion of this meeting it should have been clear to Judge Kachinsky that he was expected to limit his communications with M.B. to work-related matters. Judge Kachinsky, however, ignored the guidelines that had been developed. Indeed, his subsequent conduct indicated that he was upset as a result of the meeting and was determined to express his displeasure to M.B. and to reject any limitation on communications to work-related matters.

¶22 On the following Monday, just three days after the meeting, Judge Kachinsky sent M.B. an email that began with personal information about what Judge Kachinsky had done over the weekend.

¶23 On three occasions during that week, Judge Kachinsky came to the municipal court offices. He sat close to M.B.'s desk, facing her. He did nothing except tap his pen and make "cat noises." On one visit, Judge Kachinsky continued this extremely odd behavior for 45 minutes. During one of the visits, Judge Kachinsky also told M.B. a story about a dog being raped and then repeated the story a second time.

¶24 On Thursday of that week, Judge Kachinsky sent an email to M.B. discussing their personal relationship that made it clear he would not abide by any work-related limitations. He claimed that "some short general conversation about

9

interpersonal difficulties is really work related as we have to get along well as personal and professional friends to do our best."  He also referenced an evaluation of M.B. that he would be completing in the next week.

¶25 On Thursday, May 24, 2017, Judge Kachinsky sent another email to M.B., in which he inquired about having a party to celebrate his overcoming a medical problem that the two of them had discussed at the end of 2016.  M.B. replied that they did not need to have a meeting about such a party, but Judge Kachinsky continued to ask for her input about such a party, including through an email sent to her home email account.  In that same email, Judge Kachinsky again brought up their personal relationship, acknowledging that it was strained, which concerned him.  He asked if there was something either of them could do that would "bring back the happy relationship that existed from May 2016-March 2017."

¶26  M.B. sent a response email that having Judge Kachinsky come into the office to discuss plans for this party "puts me on the spot," which she did not want.  This prompted a reply from Judge Kachinsky.  In the reply, Judge Kachinsky acknowledged that he had made her uncomfortable and lamented the loss of their discussions of personal matters:  "I miss the short discussions we had on how our households functioned and other things that friends talk about.  I hope I have not blown that forever."  Early the next day, which was the Friday prior to Memorial Day, Judge Kachinsky sent another email stating that he had decided not to have the party, but suggesting that they and

their families could have a "get-together" at some point over the summer.

¶27 That same day, Village Manager Sturgell learned of Judge Kachinsky's ongoing attempts to initiate personal, non-work conversations with M.B. Sturgell and the village's attorney had a telephone conversation with Judge Kachinsky, explained potential violations of the village's policy prohibiting harassment in the workplace, advised him of the need to maintain professional decorum at work, and told him to cease communicating with M.B. about personal matters.

¶28 Judge Kachinsky sent M.B. an email over the ensuing weekend, in which he stated that he wanted to "hit the reset button." He claimed that it had not been clear to him that M.B. wished to avoid after-hours activities with him. He stated that he now understood, but he chastised M.B. for not telling him directly. He then expressed that he still believed discussion of personal matters was necessary:

> My main concern is that a "work only" discussion policy should not preclude normal "water cooler" discussion of things like the Packers, Badgers, child graduations, children having children, recent vacation adventures, etc. I need to know what you consider to be "over the line." . . . Walking on eggshells during what should be relaxed casual conversations is not good for productivity or mental health. Your ideas on this are welcome.

Judge Kachinsky also complained about the fact that M.B. had "defriended" him on Facebook, encouraged her to reverse that decision, and stated that he wanted to "start over" with "new rules." He claimed that being able to view her personal

11

Facebook page allowed him to know what was going on in her life that might impact her job performance and avoided the need for him to ask her "the usual question about how vacation or the weekend went."

¶29 When Village Manager Sturgell learned of Judge Kachinsky's email over the Memorial Day weekend, he sent a letter to Judge Kachinsky pointing out that he had violated the village's direction not to discuss the personal relationship with M.B. and reminding him that he was not to engage in any communications with her that went beyond work matters.

¶30 Approximately two weeks later Judge Kachinsky sent an email to M.B. entitled "Rule Violation." Judge Kachinsky acknowledged that the email "violate[d] every principle we have talked about regarding office conduct the last few weeks," but that he was sending it despite that fact. The email continued, "Feel free to report me to HR. I feel spunky this morning."

¶31 Judge Kachinsky's focus on his relationship with M.B. continued. On June 22, 2017, he sent another email to her suggesting that they "have a beer or wine summit . . . to discuss the relationship issue." He suggested this "summit" would be an occasion to "end the strict restrictions on no non-work related discussions and replace it with use of respect and common sense."

¶32 Two days later Judge Kachinsky sent yet another email to M.B. This time, however, he sent it to her personal email account because it involved some personal items and he wanted to "keep it off a government computer." He sent another email

12

later that same day, which was entitled "[M.B.] and Judge K Relationship Rules effective 6-26-2017." Included in that email were a set of "rules" that Judge Kachinsky was imposing for specific categories of "activities." For example, under the activity "In-chambers conversations," the rule stated as followed: "To be work-related. However, can briefly discuss outside activities (weekend and vacation plans, etc.) when does not interfere with work activities. [']Treats' to be brought in only on birthdays." Under "Out of office and after hours activities," the rule stated, "Christmas only for exchange of gifts etc. Initiation of any other activities by [M.B.] only (Judge K Challenge Runs, wine at Holidays, etc.)." The chart also had rules for activities labeled "Professional friendship" and "Personal friendship." For the latter, the rule stated, "Yes but not 'besties' and subject to limits above."

¶33 On June 26, 2017, Judge Kachinsky sent an email to Human Resources Manager Malone, in which he claimed that the seven incidents about which M.B. had complained were "minor" and that her unwillingness to accept his view of how their relationship should work would be detrimental to the municipal court office. His email stated that he preferred not to work with "such a person any longer than possible." He suggested that Malone should advise M.B. to "give a little bit on the work-only thing." If M.B. did not do so, he stated that "[t]he alternative for me is to exercise my authority under Sec. 755.10(1) to terminate employment." The email stated that Judge Kachinsky had communicated with other individuals about the

13

municipal court manager position, discussed a possible termination date for M.B., and stated that Judge Kachinsky had a plan for obtaining resumes and quickly hiring a replacement manager. On June 29, 2017, Judge Kachinsky sent another email to Malone stating that while he had not made a final decision on whether to fire M.B., she had until 5:00 p.m. that day to decide if she accepted his list of "rules" regarding their professional and personal relationship. The Judicial Conduct Panel found that by these emails, Judge Kachinsky demonstrated that he believed he could terminate M.B.'s employment for declining to have a low-level personal relationship with him.

¶34 Later on June 29, 2017, the village's attorney sent a letter to Judge Kachinsky via email, in which the attorney informed Judge Kachinsky that his conduct toward M.B. was a continued pattern of violating the village's policy against harassment and that his threats to terminate M.B. constituted retaliatory conduct, which if carried out would be a violation of law. The letter once again directed Judge Kachinsky to cease personal communications with M.B. and to cease making threats to terminate her employment. The Judicial Conduct Panel found that "[i]t is hard to imagine how the message could have been more clear; Judge Kachinsky was putting the village at risk of a potential lawsuit for his own personal reasons."

¶35 Rather than take the village attorney's letter to heart, Judge Kachinsky elevated his conduct. After receiving the letter, he posted to his Facebook page that "[t]he sh— is not over. I might have an employee termination today. Not

14

mine." The Judicial Conduct Panel found that while the post did not explicitly name M.B., the only conclusion a reader could draw was that M.B. was about to be fired because she was the only employee he supervised either at the municipal court or in his private law practice.

¶36 At 12:50 a.m. on Saturday, July 8, 2017, Judge Kachinsky sent an email to Human Resources Manager Malone, with a blind copy to M.B. The email stated that Judge Kachinsky was "unfriending" Malone on Facebook. The email stated, "At least I told you directly. Some cowards don't." The Judicial Conduct Panel found that the "coward" reference was directed toward M.B. Judge Kachinsky admitted in his answer to the Judicial Commission's complaint that this email had been spiteful in tone and that his conduct in sending the email had not exhibited patience, dignity, or courtesy.

¶37 A particularly disturbing event occurred on July 17, 2017. While alone with M.B. in the municipal court office, Judge Kachinsky lunged over M.B.'s desk, knocking some items off of it. While he did so, Judge Kachinsky whispered to M.B., "Are you afraid of me now?" This conduct frightened M.B. The Judicial Conduct Panel found that this action by Judge Kachinsky "was an attempt to intimidate M.B. into acquiescing in his fixation on a personal relationship with her."

¶38 On July 20, 2017, while the municipal court was in session, Judge Kachinsky told M.B. to "cool your jets" in a voice loud enough for Malone to hear it in the back of the courtroom. The Judicial Conduct Panel found, however, that

15

there was not clear and convincing evidence that the comment had been made in an aggressive or disrespectful manner.

¶39 At the conclusion of the court session that evening, Judge Kachinsky ran into something on his way out of the courtroom, causing his arm to bleed. Rather than find a paper towel to stop the bleeding, Judge Kachinsky used his pay stub envelope. He then left the blood-stained envelope on his desk in the municipal court office, where it would be readily observed by M.B. The Judicial Conduct Panel found Judge Kachinsky's explanation that this was simply a way to remind himself to buy some bandages to place in his desk to be unconvincing. It determined that this was an attempt either to intimidate M.B. or to elicit sympathy from her. In either event, it was an intentional non-verbal communication that had nothing to do with work.

¶40 Later that same evening Judge Kachinsky sent M.B. an email once again bringing up their relationship. The email contained the following statements:

> In short, if you want to restore a happy workplace, the first step is to stand up on your own and not use the Administration as a crutch. . . . I can overlook what I consider poor judgment in handling a situation. I cannot tolerate a weakling unwilling to have free and open discussions with the boss (or insubordination). (Emphasis added.)

¶41 As a result of Judge Kachinsky's ongoing actions, Village Manager Sturgell held another meeting with him on July 26, 2017, regarding the need to keep the relationship between Judge Kachinsky and M.B. work-related. After that meeting,

16

Judge Kachinsky went to the municipal court office, dropped a white flag he had fashioned from some office supplies on M.B.'s desk, and said, "Here you go, I surrender, you win."

¶42 Judge Kachinsky, however, was far from ending his campaign. In an August 21, 2017 email to a local attorney, Judge Kachinsky falsely stated that M.B. was "looking for new employment," that there was a personality conflict between the two of them, and that she was not facing "imminent termination."

¶43 On September 5, 2017, Judge Kachinsky left on his desk a mock letter announcing his resignation, on which he wrote "refused to sign." The letter was left in a place were M.B. would see it. The Judicial Conduct Panel found that Judge Kachinsky did this as a subtle communication to M.B. about their ongoing conflict.

¶44 On October 27, 2017, Judge Kachinsky wrote a letter to M.B. reprimanding her for forwarding to Village Manager Sturgell two emails Judge Kachinsky had written to her. The letter stated that she was required to discuss any concerns about the emails with him first and that her forwarding of the emails to Sturgell had constituted going "outside the chain of command without a good reason."

¶45 On November 2, 2017, in the presence of both M.B. and Human Resources Manager Malone, Judge Kachinsky mentioned both Harvey Weinstein and Bill O'Reilly. He then stated loudly, "I don't do that crap and you should get that through your thick head." The Judicial Conduct Panel found that the comment was directed to both of them.

17

¶46 The next day after this outburst, Judge Kachinsky sent a letter to M.B. stating that his October 27, 2017 letter of reprimand had been intended to be a "teaching tool to catch your attention." The email contained the following statements:

> By this time next week some things are going to happen that will cause a lot of fire and fury at the Municipal Building. No, I am not resigning. Just be psychologically prepared. Have a good weekend.

The Judicial Conduct Panel found that this was not related to the work of the municipal court. It found that the email, including the reference to "fire and fury," was so disturbing to M.B. and to village officials that the village police were notified. When the village police chief interviewed Judge Kachinsky about the email, he giggled more than once in response to the police chief's questions.

¶47 On Saturday, November 25, 2017, Judge Kachinsky sent yet another email to M.B., with this one bearing the subject line "Thanksgiving Greeting." The email referenced a pre-Thanksgiving email in which Judge Kachinsky had wished M.B. and her family a happy holiday. Although the prior email had not requested a reply, Judge Kachinsky scolded M.B. for ignoring him. The email also included the following statements:

> Will not spend the next 1.5 years or 5.5 years working with someone who actively despises me. I have told you this many times. We are approaching the end of the line on this.

In addition, the email discussed the ongoing Judicial Commission investigation. The email concluded with the following statements: "There was an allegation missing from the

additional letter from the [Judicial Commission]. Please see attached." The attachment to the email was a picture of a kitchen sink. At the evidentiary hearing in this proceeding, Judge Kachinsky admitted that the email had been sarcastic in tone.

¶48 The next day Judge Kachinsky dropped off a second reprimand letter to M.B. The letter reprimanded M.B. for allegedly making false statements that Judge Kachinsky was stalking or tracking her in her complaint to the human resource manager and village manager six months earlier. Ultimately, after reviewing a grievance M.B. filed about the reprimand letter, Judge Kachinsky directed that the letter be removed from M.B.'s personnel file.

¶49 On Saturday, December 23, 2017, Judge Kachinsky wrote a third letter of reprimand to M.B. The alleged basis for this reprimand was M.B.'s refusal to acknowledge or return Christmas greetings by Judge Kachinsky and her failure to respond in a positive way to his efforts to improve workplace rapport. Judge Kachinsky also emailed the letter to M.B.'s personal email account. He subsequently prepared a post to his Facebook page, in which he used a sad face emoji and made the following comment: "Len Kachinsky was feeling sad. Few things are sadder than a co-worker who refuses to return a Merry Christmas greeting out of spite." The Judicial Conduct Panel found that it was clear to readers of this post that it was directed to M.B. since she was his only co-worker/employee.

¶50 A meeting was held on December 28, 2017, that involved Village of Fox Crossing Police Captain Peter DeBoer, Judge Kachinsky, and M.B. During the meeting, Judge Kachinsky disclosed detailed information about where M.B., her parents, her brother, and her sister lived, as well as who was the sister's employer and where that employer was located. Although the disclosure of this personal information was obviously upsetting to M.B., Judge Kachinsky continued to discuss the detailed information. The Judicial Conduct Panel found that a reasonable person would have understood Judge Kachinsky's disclosures to be threatening and offensive and that M.B., in fact, perceived them to be an effort to upset and intimidate her.

¶51 In an email sent approximately one week later, Judge Kachinsky disclosed additional personal details about the value of M.B.'s home and the nature of the financing she had obtained to purchase the home. The Judicial Conduct Panel found that there was nothing work-related about such information.

¶52 On January 14, 2018, Judge Kachinsky sent a letter to M.B. that he labeled as a "Letter of Counseling: Failure to Obey Lawful Order." In the letter, Judge Kachinsky recounted that he had asked M.B. to forward to him information she might receive about a farewell luncheon or party for two departing village police officers. The letter said that this had been a "lawful order" and that her failure to forward the requested information to him had been "disrespectful."

20

¶53 Judge Kachinsky's continuing conduct toward M.B. about what he viewed as a failure to maintain a personal relationship led her to file a petition seeking a harassment injunction. A Winnebago County court commissioner considered the petition and granted a temporary injunction on February 15, 2018. The court commissioner's oral ruling stated that "All communication moving forward should be work-related and essential to the functioning of the Village of Fox Crossing Municipal Court."

¶54 Judge Kachinsky's emails to M.B. continued despite the temporary injunction. On the same day that the temporary injunction was issued, which was a Thursday on which a court session was to be held in the evening, Judge Kachinsky sent an email to M.B. indicating that he wanted her to observe him in a closed setting prior to the court session to see if he showed any signs of impairment. Such observation was not part of M.B.'s job. Because she was not trained to make such assessments, she refused Judge Kachinsky's directive/request.

¶55 Two weeks later Judge Kachinsky sent an email to M.B. with a link to a newspaper article about a dispute between a circuit court judge and a clerk in another county. Referencing that dispute, the email included the comment that "[i]t could be worse." The Judicial Conduct Panel found that this email was not necessary or pertinent to the functioning of the municipal court.

¶56 In June 2018 a Winnebago County circuit court conducted a de novo review of the temporary injunction. It affirmed the harassment injunction and extended it until May 1,

21

2019. During the hearing, the circuit court judge advised Judge Kachinsky that the court was issuing an injunction "prohibiting any conduct or contact between you and [M.B.] other than that absolutely necessitated through the course of your employment." The written injunction order directed Judge Kachinsky to cease harassment of M.B., to have no contact with her outside of work, and to have no contact with M.B.'s family members. The written injunction further specified that "[a]ll communications between Respondent and Petitioner shall be limited to what is necessary to perform the functions of the Village of Fox Crossing Municipal Court. It further explained that "[c]ommunications related to the personal relationship or personal rapport between Respondent and Petitioner are not included in the operation of the court and are prohibited under this section." (Emphasis added.)

¶57 This permanent injunction did not cause Judge Kachinsky to cease his communications with M.B. Over a weekend less than two weeks after the permanent injunction was entered, Judge Kachinsky left a color poster on his desk where M.B. would see it. The poster had a picture of the village manager's face, with the following accompanying caption: "I am from the government and I am here to help you. WWRD #notmetoo." The Judicial Conduct Panel found that this was reasonably perceived to be a communication directed toward M.B. and that it was not a communication related to the operation of the municipal court.

¶58 At some point over that same weekend, Judge Kachinsky posted on his desk facing M.B.'s desk a copy of a page from the

22

village's personnel policy manual, entitled "Sexual Harassment." On the page Judge Kachinsky had highlighted the word "sexual" seven times in yellow marker. Judge Kachinsky testified at the evidentiary hearing that he had posted the policy to educate M.B. and to demonstrate to her that his conduct did not meet the criteria of sexual harassment. The Judicial Conduct Panel found, however, that M.B. had not accused Judge Kachinsky of sexual harassment. It further found that the posting of the policy had no demonstrated connection to the operation of the municipal court.

¶59 When M.B. arrived at work the following Monday, July 2, 2018, she observed both the poster and the copy of the sexual harassment policy. M.B. believed that the two documents violated the terms of the harassment injunction. Consequently, either she or another village employee contacted the police, who arrested Judge Kachinsky.[3]

¶60 On July 11, 2018, the state filed a criminal complaint against Judge Kachinsky. The complaint charged Judge Kachinsky with one count of felony stalking and two misdemeanor counts of violating a harassment injunction. Shortly before the trial in the criminal case, the district attorney's office dropped the two misdemeanor counts. The case proceeded to trial solely on

---

[3] As was noted above, on July 3, 2018, this court issued an order in its superintending and administrative authority that prohibited Judge Kachinsky from exercising the powers of a municipal judge.

the felony charge. A jury found Judge Kachinsky not guilty of that felony charge.

¶61 Based on these facts, the Judicial Conduct Panel concluded that Judge Kachinsky had violated SCRs 60.02[4] and 60.03(1)[5] in a number of ways.[6] Supreme Court Rule 60.02 requires that a judge, in every aspect of judicial behavior, shall "participate in establishing, maintaining and enforcing

---

[4] SCR 60.02 provides:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. This chapter applies to every aspect of judicial behavior except purely legal decisions. Legal decisions made in the course of judicial duty on the record are subject solely to judicial review.

[5] SCR 60.03(1) provides: "A judge shall respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

[6] The Judicial Commission further alleged that Judge Kachinsky's conduct toward M.B. also violated SCR 60.04(1)(d), which requires judges, in the performance of their "adjudicative responsibilities" to be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity. The Judicial Conduct Panel did not reach a decision as to whether Judge Kachinsky's conduct had also violated SCR 60.04(1)(d) because it would have required briefing on the scope of a judge's "adjudicative responsibilities" and it did not have time to receive such briefing and to render a decision on that issue of law. Consequently, we also do not do not decide whether Judge Kachinsky's conduct violated SCR 60.04(1)(d). It is not necessary that we decide that issue in this case.

24

high standards of conduct and shall personally observe those standards . . . ." Supreme Court Rule 60.03(1) requires that a judge shall "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The comment to that rule recognizes that "[p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct of judges" and that "[a] judge must avoid impropriety and the appearance of impropriety."

¶62 Specifically, the Judicial Conduct Panel ruled that Judge Kachinsky had violated these two rules of judicial conduct by engaging in the following conduct, which the panel concluded had been irresponsible and improper conduct that was unbecoming of a judge:

- After being told on May 4, 2017, by the village's human resource manager that he should limit communications with M.B. to work matters and should limit visits to the municipal court office to one time per week, unless otherwise needed, Judge Kachinsky sent several emails to M.B. that included personal matters; he visited the municipal court office three times in one week, during which he made "cat noises" while facing M.B.'s desk and told her a story about a dog being raped; he insisted that he needed to have a personal friendship with M.B.; and he invited her to participate in a non-work activity.

- Following a May 26, 2017 phone call with the village manager and the village attorney during which he was

25

again told to maintain a professional decorum at work and to avoid contacting M.B. regarding personal matters, Judge Kachinsky sent M.B. an email asking to "hit the reset" button on their relationship and to reverse her decision to "unfriend" him on Facebook.

- Following a May 30, 2017 letter from the village manager again informing Judge Kachinsky not to engage M.B. in communications regarding non-work matters, he sent her emails with personal greetings, invited her to meet outside the office, and attempted to negotiate work rules that required a personal friendship as a condition of her employment. He also considered terminating her employment for her refusal to agree to have a personal friendship at work and he publicly posted on Facebook that her employment might be terminated.

- Following receipt of a June 29, 2017 letter from the village's attorney, Judge Kachinsky copied M.B. on an email in which he referred to her as a "coward," lunged over her desk and asked if she was now afraid of him, left a bloody envelope on his desk for M.B. to see, and directly called her a "weakling."

- After receiving a July 21, 2017 letter from the Judicial Commission that cautioned him to avoid retaliatory conduct or witness intimidation, Judge Kachinsky engaged in several acts of retaliatory conduct, including reprimanding M.B. on three separate

26

occasions, sent M.B. a separate "counseling letter," sent her the "kitchen sink" email, continued to threaten to terminate M.B.'s employment, sent an email to a local attorney misrepresenting that M.B. was seeking other employment, submitted a Facebook post that denigrated M.B. for refusing to return a Christmas greeting, and distressed M.B. by disclosing that he knew detailed information about her and her family members.

- In the fall of 2017 Judge Kachinsky continued to reject any work-related limitations on his communications with M.B., including dropping a white flag on her desk, sending the "fire and fury" email to M.B., which was so disturbing to M.B. that the police had to become involved, and scolding her for not responding to his Thanksgiving greetings.

- After a temporary harassment injunction had been entered against him and the court commissioner had told him to limit communication with M.B. to work-related matters essential to the functioning of the municipal court, Judge Kachinsky sent M.B. the email asking her to observe him for signs of impairment although that was not her job, and sent her the February 27, 2018 email that her situation could be worse, like the dispute between the circuit court judge and the clerk of court in another county.

27

- Finally, after having the permanent harassment injunction entered against him, which advised him that communication about his personal relationship with M.B. was not work-related and was prohibited, Judge Kachinsky placed the village manager's picture and caption on his desk and posted the village's sexual harassment policy, with the word "sexual" highlighted throughout.

¶63 The Judicial Conduct Panel further concluded that the judicial code violations described above had been willful.  It therefore ruled that those violations constituted judicial misconduct pursuant to Wis. Stat. § 757.81(4)(a).

¶64 On the other hand, the Judicial Conduct Panel concluded that Judge Kachinsky's comment to M.B. to "cool your jets" did not constitute a violation of SCR 60.02 or SCR 60.03(1) because there was not clear and convincing evidence that the remark had been disrespectful courtroom conduct.  It also found that some of his other conduct did not rise to the level of a judicial code violation.

**Communications with Village Board Member**

¶65 The second category of allegedly improper conduct related to a July 14, 2017 email Judge Kachinsky sent to a member of the village board.  By the date of the email, Judge Kachinsky had been informed that an ethics complaint had been lodged against him with the Judicial Commission.  In the email to Village Board member Dale McNamee, Judge Kachinsky asked what role, if any, the village board had played in lodging the ethics

28

complaint and what the board knew about his interactions with M.B. and the village management. In the email, Judge Kachinsky stated that "if the Village is the party pursuing the complaint to the Judicial Commission, I think the Board should consider defunding it in closed session." In the signature block in the email, Judge Kachinsky identified himself as a judge.

¶66 The Judicial Conduct Panel found that although he identified himself as a judge in his email, Judge Kachinsky had not used his title to influence any action by the village board. Consequently, the Judicial Conduct Panel concluded that Judge Kachinsky had not violated SCR 60.03(2), which prohibits a judge from using the prestige of a judicial office to advance the judge's private interests.[7]

**Ex Parte Communication with Police Chief**

¶67 On July 24, 2017, Judge Kachinsky sent an email to the village's chief of police that referenced a pending municipal court case involving a charge of operating a motor vehicle while intoxicated (OWI). Judge Kachinsky sent copies of the email to the village's attorney, to M.B., and to a police records clerk,

---

[7] SCR 60.03(2) provides:

> A judge may not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge may not lend the prestige of judicial office to advance the private interests of the judge or of others or convey or permit others to convey the impression that they are in a special position to influence the judge. A judge may not testify voluntarily as a character witness.

29

but did not send a copy to the defendant or to any attorney representing the defendant. In the email Judge Kachinsky suggested that the police chief or village attorney might want to speak with the prosecutor or police in a neighboring jurisdiction about the status of two OWI citations issued to the defendant in that jurisdiction. The email explained that the number of prior OWI convictions impacts the nature of the current OWI charge and the associated penalties, and it further indicated that the neighboring municipality may have lost jurisdiction over their citations.

¶68 The Judicial Conduct Panel found that this email had been for the purpose of determining whether the citations in the other municipality had been converted to criminal OWI offenses by operation of law and that the email had not been an ex parte communication about the proceeding pending in the Village of Fox Crossing Municipal Court. The Judicial Conduct Panel stated that the email had not given any party a procedural or tactical advantage. It therefore concluded that the Judicial Commission had failed to prove that Judge Kachinsky had violated SCR 60.04(1)(g), which prohibits judges from initiating, engaging in, or considering ex parte communications about a pending action.[8] The Judicial Conduct Panel determined that the email

---

[8] SCR 60.04(1)(g) provides:

A judge may not initiate, permit, engage in or consider ex parte communications concerning a pending or impending action or proceeding except that:

(continued)

30

had not related to the substance of the citation pending in Judge Kachinsky's court and that it had been sent for scheduling and administrative purposes.

**Recommendation Regarding Discipline**

¶69 Having determined that Judge Kachinsky had violated SCRs 60.02 and 60.03(1) in multiple ways in his interactions with M.B., the Judicial Conduct Panel turned to a discussion of the nature of Judge Kachinsky's misconduct and the appropriate level of discipline. It noted that, as explained in the preamble to the Code of Judicial Conduct, both SCR 60.02 and SCR 60.03(1) are phrased in general terms that set forth principles that their specific provisions are intended to foster, and therefore constitute touchstones against which judicial conduct is to be measured. Preamble to SCR ch. 60. Further the Judicial Conduct Panel stated that such code provisions require a judge to conduct himself or herself at all times in a manner

---

1. A judge may initiate, permit, engage in or consider ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits if all of the following conditions are met:

a. The judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication.

b. When the ex parte communication may affect the substance of the action or proceeding, the judge promptly notifies all of the other parties of the substance of the ex parte communication and allows each party an opportunity to respond.

that maintains the trust and confidence of the public in the judicial system. See In the Matter of the Complaint Against Seraphim, 97 Wis. 2d 485, 510, 294 N.W.2d 485 (1980) ("When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man, but lose respect for the court over which he presides as well."). Consequently, the Judicial Conduct Panel considered the degree to which the judge's personal conduct was indicative of the judge's lack of respect for the legal system. Comment to SCR 60.03(1).

¶70 The Judicial Conduct Panel stated that in this case, it took "little discussion to conclude that Judge Kachinsky's conduct toward [M.B.] was such that it would cause persons to question his character and even more so, lose respect for his willingness and ability to comply with and enforce restrictions that make this a society of laws and justice rather than one of selfish indulgence for a person's own desires." The Judicial Conduct Panel stated that despite numerous interventions and directives by not only village representatives, the police, a circuit court commissioner, and a circuit court judge, Judge Kachinsky persisted in engaging in conduct contrary to those directives and "was driven solely by his own myopic view of what his work relationship with [M.B.] should be." It further explained that Judge Kachinsky was charged with knowledge of the ethical code applicable to judges and that his violations of the

code had been willful because they had been freely done in the absence of any duress or coercion.

¶71 With respect to the appropriate level of discipline, the Judicial Conduct Panel properly stated that the discipline imposed on a judge should be responsive to the gravity of the judge's misconduct and sufficient to protect the public from unacceptable judicial behavior, given the seriousness of the misconduct and the likelihood of its recurrence. See, e.g., In re Judicial Disciplinary Proceedings Against Gorenstein, 147 Wis. 2d 861, 873, 434 N.W.2d 603 (1989); In re Judicial Disciplinary Proceedings Against Aulik, 146 Wis. 2d 57, 77, 429 N.W.2d 759 (1988).

¶72 The Judicial Conduct Panel found Judge Kachinsky's misconduct to be aggravated. It noted that Judge Kachinsky had engaged in a pattern of multiple violations of the Code of Judicial Conduct that had occurred over an extended period of time. Further, Judge Kachinsky had repeatedly refused to modify his conduct, although numerous individuals and even judicial officials had told him that he needed to do so. The Judicial Conduct Panel further found that Judge Kachinsky had used his position as M.B.'s supervisor to satisfy his own personal desires for more than a work relationship with M.B. Finally, although the misconduct had occurred outside of the courtroom, it had occurred within the municipal court office, and the effect of his misconduct, including his disregard for directives given to him, had seeped into the administration of the village

and had created a public dispute, which had damaged the public's respect for the judiciary.

¶73 The Judicial Conduct Panel determined that Judge Kachinsky's misconduct was similar in nature and degree to that found in In the Matter of the Complaint Against Van Susteren, 118 Wis. 2d 806, 815, 348 N.W.2d 579 (1984). In that case Judge Van Susteren had engaged in personal conduct (refusing to comply with a court order to probate his brother's estate) that had showed a "disdain, if not outright contempt, for the very system which he, as a judge, has sworn to administer." Id. This court ultimately suspended Judge Van Susteren for a period of two years as discipline for his misconduct. Similarly, Judge Kachinsky had disregarded directives and showed a disdain for systems put into place to avoid harassment in the workplace.

¶74 The Judicial Conduct Panel further compared Judge Kachinsky's persistence in engaging in his misconduct to the Gorenstein case. In that matter, Judge Gorenstein was found to have repeatedly made insulting and offensive comments from the bench to litigants, witnesses, and attorneys, as well as to have made false statements about a state mental health facility and its staff. 147 Wis. 2d at 862-63. The judicial conduct panel in that case determined that Judge Gorenstein had committed judicial misconduct on an "aggravated and persistent basis" by "permitting his personal concept of justice to override the law, administering his office without due regard to the integrity of the legal system, [and] being intemperate and impatient." Id. at 863. Although Judge Gorenstein had retired from his judicial

34

office before the commencement of the judicial disciplinary proceeding, this court suspended him from serving as a judge for a period of two years. Id. at 863, 875.

¶75 The Judicial Conduct Panel found that Judge Kachinsky, like Judge Gorenstein, had repeatedly allowed his personal perceptions (about the nature of his relationship with the municipal court manager) to interfere with his responsibilities as a judge, although not to the same degree that Judge Gorenstein had.

¶76 Ultimately, although it recognized that Judge Kachinsky's term as the Village of Fox Crossing Municipal Judge was about to expire on April 30, 2019, the Judicial Conduct Panel stated that his removal from active judicial service did not insulate him from discipline. See In the Matter of the Complaint Against Sterlinske, 123 Wis. 2d 245, 258, 365 N.W.2d 876 (1985). Given that Judge Kachinsky's years of service as a municipal judge would make him eligible to be appointed as a reserve municipal judge under Wis. Stat. § 800.065, the Judicial Conduct Panel recommended that this court suspend him from eligibility for service as a reserve municipal judge for a period of at least one year and not more than three years. It also recommended, in light of Judge Kachinsky's persistent and aggravated conduct toward M.B., that he be ineligible to serve as a reserve municipal judge in the Village of Fox Crossing Municipal Court for as long as M.B. was employed as the manager for that court.

**Judge Kachinsky's Response to the Judicial Conduct Panel's Report**

¶77 In light of the fact that Judge Kachinsky had already been prohibited from exercising the powers of a municipal judge, we modified the review process generally applicable to judicial conduct proceedings to require the parties to submit simultaneous opening and response briefs.

¶78 As the Judicial Commission objected only to the level of discipline recommended by the Judicial Conduct Panel, we focus on the arguments made in Judge Kachinsky's briefs.

¶79 Judge Kachinsky's primary argument is that the Judicial Conduct Panel based its report on the erroneous assumption that the village's Manager, Human Resources Manager, and attorney had authority to regulate his interaction with the municipal court manager. He asserts that those individuals had no authority to interfere with his supervision of his clerk. He points to Wis. Stat. § 755.10(1), which provides that a municipal judge is to appoint the clerk and other personnel authorized by the municipal counsel or board and that the hiring, termination, hours of employment, and work responsibilities of the court personnel are to be subject to the municipal judge's authority. Judge Kachinsky asserts that although the statute does not explicitly state that a municipal judge is the supervisor of the municipal court clerk, the statutory designation of the municipal judge as having authority over hiring, termination, and work responsibilities gives the municipal judge the usual responsibilities of a supervisor to

36

oversee, motivate, evaluate, and correct the performance of the municipal court clerk.  As further support for this proposition, Judge Kachinsky cites the Legislative Reference Bureau's analysis of 2009 Senate Bill 383 (ultimately enacted as 2009 Wisconsin Act 402), which referenced a municipal judge's "supervisory authority" in the context of stating that such authority was a prohibited subject of collective bargaining.

¶80  In light of his supervisory authority as the municipal judge, Judge Kachinsky argues that no other authority (except for a higher court) could interject itself into his supervision of court personnel.  He frames this essentially as a separation of powers problem, stating that having created the municipal court as a co-equal branch of government, the village was obligated to recognize the independence of the municipal court as a co-equal branch of government.  Thus, he asserts that the village had no authority to monitor his in-person conversations with M.B. to "protect" her from the possibility of physical or emotional abuse, which he says, in any event, never occurred or was likely to occur.  Because the village lacked any authority to interfere with his supervision of M.B., Judge Kachinsky contends that he had no obligation to follow the directives of the village's representatives and cannot be disciplined for having  failed to do so.

¶81  Judge Kachinsky makes clear in his opening brief that he viewed his conduct toward M.B. as mere supervision of a resistant employee in an effort to "restore a level of personal rapport," which he continues to believe was a legitimate and

laudable objective that is necessary for a workplace to perform effectively. While he acknowledges that not everyone may agree with how he tried to accomplish that goal, he argues that he was free to accept or reject any "directives" issued by village representatives. Indeed, he contends that he was also free to accept or reject M.B.'s request to avoid any communications that might be construed as personal by her.

¶82 We need not decide the separation of powers issue raised by Judge Kachinsky. Whether or not he was legally obligated to abide by the directives given by representatives of the village, he was obligated by the relevant provisions of the Code of Judicial Conduct to maintain high standards of personal conduct and to act in a manner that promotes the integrity of the judiciary. We fail to see how staring at a court employee for 45 minutes while tapping a pencil and making cat noises constitutes the maintenance of high standards of personal conduct or promotes the integrity of the judiciary. Indeed, it does just the opposite. Serving the people as a judicial officer does not allow a judge to impose his/her every opinion about personal interactions on subordinate court personnel or to force those subordinates to be the judge's personal friends. Judges are entitled to ensure that their subordinate employees perform their work responsibilities in appropriate manners. Judge Kachinsky's pattern of obsessive conduct about whether M.B. liked him as a friend clearly passed well over the line and brought the municipal court he administered into public disrepute. His repeated conduct led not only to the public

38

entry of both temporary and permanent harassment injunctions against him, but ultimately resulted in his arrest and the lodging of criminal charges against him. While he was acquitted of the single felony charge that the district attorney chose to take to trial, the lack of a criminal conviction on that single charge does not mean that he is innocent of any ethical violations. The notoriety that resulted from his insistence that M.B. had to be not only his court clerk, but also his friend, certainly caused the residents of the Village of Fox Crossing who appeared in his court to question whether he had the temperament and stability to preside over their cases in a proper manner. Ultimately, we need not review every action in the lengthy summary of Judge Kachinsky's interactions with M.B. We agree with the Judicial Conduct Panel that Judge Kachinsky's interactions with M.B., as found by the Judicial Conduct Panel, apart from his comment to her to "cool your jets," constituted violations of SCRs 60.02 and 60.03(1).

¶83 Judge Kachinsky also objects to the Judicial Conduct Panel's findings that certain of his actions were meant to intimidate M.B. or to retaliate against her for reporting his conduct. He argues that the Judicial Conduct Panel's findings in this regard were erroneous because his actions did not meet the definition of "retaliation" under federal employment law. We do not read the Judicial Conduct Panel's findings, however, as constituting legal conclusions that Judge Kachinsky had violated federal employment statutes or case law. We read the Judicial Conduct Panel's comments about Judge Kachinsky's

39

retaliatory actions in the vernacular sense. Whether or not a judge's retaliatory conduct would be actionable under federal employment law, a judge should not engage in retaliation against subordinates who simply wish to limit their workplace interactions to work-related topics. Reprimanding a subordinate employee for not returning a Christmas greeting does not demonstrate the maintenance and promotion of high standards of conduct or create public confidence in the integrity of the judge issuing such a petty reprimand.[9] M.B. was required to process case files and deal with the public as a manager of the municipal court, not to satisfy Judge Kachinsky's personal opinion that employees must also be personal friends.

¶84 Judge Kachinsky's brief also asserts that some of the Judicial Conduct Panel's findings of fact were clearly erroneous. The brief then goes through the numbered findings as if it were an answer to a complaint. Most of the paragraphs state either that Judge Kachinsky agrees with the particular finding or that there was sufficient support for the finding in the record. Judge Kachinsky does offer comments that attempt to

---

[9] In his opening brief, Judge Kachinsky acknowledges that his public Facebook post criticizing M.B. for not returning his Christmas greeting "could be regarded as public venting that was conduct below the high standards of a judge," but he asserts that it was not retaliatory or intimidating. [Kachinsky opening br. at 24] The rule at issue in this case, however, did not require that the conduct be retaliatory or intimidating to be a violation. Judge Kachinsky's focus on the elements of retaliatory conduct under federal employment law is therefore misplaced in this proceeding.

explain his actions, but that does not render the Judicial Conduct Panel's findings of fact clearly erroneous.  We have reviewed Judge Kachinsky's comments and find that he has failed to prove that the findings of fact are clearly erroneous.

¶85 Next Judge Kachinsky contends that his email to M.B. about the dispute in a circuit court in another county and his posting of a copy of the village's sexual harassment policy did not violate the harassment injunction against him, which he contends was not as clear as the Judicial Conduct Panel believed.  Again, we need not decide whether or not those actions legally constituted violations of the harassment injunction, as we are not reviewing an appeal from the harassment injunction proceeding.  In this matter we are reviewing whether Judge Kachinsky's actions constituted violations of the Code of Judicial Conduct.  Even if, arguendo, those actions would not be determined to be violations of the specific terms of the harassment injunction, we have no problem in concluding that they constituted violations of the relevant supreme court rules.

¶86 Finally, we turn to the matter of the appropriate level of discipline.  Judge Kachinsky argues that the Judicial Conduct Panel's reliance on other precedents is flawed.  He asserts that his misconduct did not involve flouting clear-cut legal obligations, making direct threats, or belittling M.B.  He contends that there were incidents in which the tension he felt due to the conflict with village representatives boiled over into inappropriate comments, emails, or Facebook posts, which he

41

categorizes as demeanor violations. He suggests that an appropriate level of discipline for the relatively minor demeanor violations that he admitted would be a nine-month suspension, following which he would be eligible for appointment as a reserve municipal judge in the discretion of the chief judge of the judicial administrative district.

¶87 On the other hand, the Judicial Commission also factually distinguishes the cases cited by the Judicial Conduct Panel, but from the opposite perspective. It contends that there really has not been a comparable judicial disciplinary case in this state. It argues that Judge Kachinsky's violations were so numerous and so serious that he should be permanently barred from eligibility for reserve municipal judge status.

¶88 As is the case in most attorney and judicial disciplinary proceedings, there is no case with identical facts and rule violations. We view this matter, however, as involving serious misconduct. While his misconduct did not involve the performance of his judicial duties in the courtroom, it did occur in the context of the operation of the court over which he had been elected to preside. Although he claims that he was merely attempting to foster an environment that would be best for the operation of the municipal court, it is clear from his actions that he was intent on forcing M.B., his subordinate, to comply with his personal desire that M.B. should also be his personal friend—someone who would discuss life experiences with him, engage in activities that he favored, and conform to what he viewed as proper friend etiquette, such as exchanging holiday

42

greetings. Even if his intentions had been to benefit the municipal court, the effect of his behavior was the opposite. His actions, which cannot be dismissed as merely odd or quirky, caused real harm both to the particular staff member (by causing her fear, discomfort, and considerable stress) and to the effective operation and public standing of the municipal court. His actions also negatively affected the village as a whole, which had to mediate between him and M.B., a village employee.

¶89 In the end, we agree with the Judicial Conduct Panel that, in light of the fact that Judge Kachinsky is no longer an active municipal court judge, an appropriate form of discipline for his misconduct would be to suspend his eligibility to serve as a reserve municipal judge. While we recognize that there are factual differences with both Van Susteren and Gorenstein, we conclude that Judge Kachinsky's misconduct has some similarities to the misconduct in those cases and warrants a substantial period of suspension. We therefore suspend Judge Kachinsky's eligibility for appointment as a reserve municipal judge for a period of three years. In light of our July 3, 2018 superintending order prohibiting Judge Kachinsky from exercising the powers of a municipal judge, we make the suspension retroactive to the date of that order. In addition, because Judge Kachinsky's misconduct demonstrates that he currently lacks the judicial temperament and the insight into his actions that are required for a judge to preside over and manage a court, we also require him to petition this court and successfully demonstrate to us that he is fit to serve as a

43

reserve municipal judge before he may request an appointment to serve as a reserve municipal judge from the chief judge of the applicable judicial district.[10]

¶90 IT IS ORDERED that Leonard D. Kachinsky is suspended from eligibility for appointment as a reserve municipal court judge for a period of three years, commencing July 3, 2018.[11]

¶91 IT IS FURTHER ORDERED that before Leonard D. Kachinsky may request appointment as a reserve municipal court judge by the chief judge of the applicable judicial administrative district under Wis. Stat. § 800.065, he must first file a petition with this court and demonstrate through appropriate evidence his fitness to serve as a reserve municipal court judge.

---

[10] Judge Kachinsky may not file such a petition in this court until the three-year period of suspension has expired. We also note that even if this court would find at that time that Judge Kachinsky had demonstrated his fitness to serve once more as a reserve municipal judge and would therefore grant his petition, the chief judge of the applicable judicial administrative district would still have discretion under Wis. Stat. § 800.065 regarding whether to appoint him as a reserve municipal judge.

[11] In light of the resolution of this judicial disciplinary proceeding, we terminate the prohibition that we placed on Judge Kachinsky's exercise of the powers of a municipal judge in our July 3, 2018 order issued under our superintending and administrative authority over the courts of this state.